The Committee on Character and Fitness of the Alabama State Bar refused to certify Charles Neville Reese as a law student. The Board of Bar Commissioners sustained this ruling and Reese appealed to this Court.
In September, 1975, Reese entered Jones Law Institute in Montgomery. Pursuant to Rule 1, Rules Governing Admission tothe Alabama State Bar, Reese executed his sworn application for registration as a law student on February 25, 1976, and filed it with the Secretary of the Alabama State Bar on March 1, 1976.
Question (6)(a) of the application reads:
 "Have you ever been charged with violating any State or Federal law or City Ordinance? If so, state fully on separate *Page 566 
sheet, giving dates, places and outcome. Note: Minor traffic violations need not be shown."
Reese answered in the affirmative, stating:
 "I was charged with driving while intoxicated or under the influence of drugs in Memphis, Tennessee 12/74. I was tried and entered a plea of guilty that same month. The conviction resulted in a six month suspension of my driving privileges, $250.00 fine, four days in jail and mandatory driving classes for one night a week for six weeks.
 "In 3/75 charges were lodged against me for disorderly conduct in Memphis, Tennessee. I entered a plea of guilty and was fined $50.00."
The Committee on Character and Fitness held a meeting on June 28, 1978, and invited Reese to appear, which he did. After the meeting, the Committee declined to certify Reese as a law student. Reese appealed to the Board of Bar Commissioners. A hearing before the Board of Commissioners was postponed and Reese, through his attorney, requested to appear again before the Committee on Character and Fitness. Reese, with counsel, appeared before the Committee on Character and Fitness at a hearing on January 3, 1979.
On February 2, 1979, the Committee on Character and Fitness entered its order, refusing to accept Reese's registration as a law student, stating that:
 "One of the moving considerations in the Committee's decision was the applicant's lack of candor in revealing his criminal record. Some offenses were disclosed at the first hearing. Thereafter, the Committee received information of other offenses and at the second hearing, in response to a direct question, the applicant stated that he had made a full disclosure and there were no other offenses. However, when he was confronted with information pertaining to other offenses he admitted them. At the third hearing, applicant disclosed still other offenses.
 "The Committee is mindful of the recommendations of Judges and other outstanding members of the Bar.
 "However, the Committee finds that the applicant has failed to reasonably satisfy the Committee that he possesses the necessary character and fitness to become a member of this Association."
Reese appealed this ruling of the Committee to the Board of Commissioners of the Alabama State Bar. The Board of Bar Commissioners sustained the ruling of the Committee on Character and Fitness after a review of the transcript of the proceedings before the Committee on Character and Fitness.
We have reviewed the record, and considered the oral arguments made by counsel for Reese and for the Alabama State Bar, and we find that the refusal of the Alabama State Bar to certify Reese as a law student is due to be reversed. The issues presented and discussed in this opinion are:
(1) What is the standard of review by this Court in cases involving a refusal by the Bar to certify a person as a law student?
(2) What constitutes the "good character" that is required of applicants for registration as law students?
(3) What constitutes a prima facie showing of "good character" required of applicants?
(4) Once an applicant makes a prima facie showing of good character, upon what basis may the Committee on Character and Fitness disapprove an application on the ground that the applicant did not possess the requisite "good character"?
 I
We first discuss the standard of review in this case.
At the time Reese made application for registration as a law student, the rules governing admissions provided:
 "From the ruling of the Committee on Character and Fitness . . . declining to approve the application of an applicant to take the State Bar Examination or making any finding or ruling adverse to any applicant, an appeal shall lie *Page 567 
to the Board of Commissioners, if notice of the desire to take such appeal is filed with the Secretary within thirty days after the applicant has been notified of the action of such committee. Such appeal shall be heard and determined de novo at the next regular, adjourned or special meeting of the Board held after the appeal has been taken." 35 Ala. Lawyer 336 (July 1974).
There are no rules of procedure which govern the manner in which this Court's jurisdiction is invoked to review the final actions of the Board of Commissioners of the Alabama State Bar in denying an application for admission. Neither is there any rule which specifies the scope of this Court's review. This Court previously considered an appeal from the final action of the Board of Bar Commissioners in Ex parte Weinberg, 281 Ala. 200, 201 So.2d 38 (1967). There, this Court, after an independent review of the record, affirmed the judgment of both the Committee on Character and Fitness and the Board of Bar Commissioners.
In the case before us, the Board of Bar Commissioners specifically ruled that no additional testimony would be taken in the case and that the Board of Bar Commissioners would only hear oral arguments by and on behalf of the applicant and by the general counsel of the Alabama State Bar. The Board of Bar Commissioners made its decision to affirm the ruling of the Committee on Character and Fitness after considering the record which had been established and furnished to it. In view of this posture of the case, we determine that the proper scope of review of this Court is on the record which was available to the Board of Bar Commissioners. Consequently, we do not indulge in any presumption in favor of the findings by the Committee on Character and Fitness.
 II
It seems apparent from the order of the Committee on Character and Fitness that "one of the moving considerations in the Committee's decision was the applicant's lack of candor inrevealing his criminal record." (Emphasis added). The record does show that as a result of an investigation by the Committee on Character and Fitness and two hearings before the Committee on June 28, 1978, and January 3, 1979, at which Reese appeared, was interrogated and testified, that other incidents than those listed by him on his application came to light where Reese was apprehended by law enforcement officers. Some of these incidents resulted in formal charges, but others did not.[1] On the other hand, the record does *Page 568 
show that even though Reese did not list the other incidents when he filed his application, he appeared before the Committee and answered every question any member of the Committee asked him concerning every incident, whether the incident should have been listed in answer to question (6)(a) or not.[2]
The Committee on Character and Fitness noted that it was "mindful of the recommendations of judges and other outstanding members of the Bar," but apparently, the Committee did not think that these recommendations outweighed the Committee's finding of Reese's "lack of candor in revealing his criminal record." The record contains letters from twenty-eight judges and attorneys and citizens and many of those who wrote letters on Reese's behalf indicated that they were familiar with his past "brushes with the law." The contents of these letters are unimpeached. The record does contain one letter from "a concerned citizen" and one from a former secretary of Reese's father which attack his good character and there is an affidavit in the record by an individual who stated that Reese had violated the law while a student at Jones Law Institute. If the Committee on Character and Fitness considered these communications, there is no indication in the record that Reese was afforded an adequate opportunity to cross-examine the individuals who made these assertions. It should be noted, however, that the Bar does not appear to justify its refusal to certify Reese on the basis of these derogatory letters.
The Bar's position, succinctly stated, seems to be that Reese's failure to list the incidents in his original sworn application "fully justifies the action of the Committee on Character and Fitness and the Board of Commissioners." We must respectfully disagree.
The Alabama State Bar, as an arm of this Court, can legitimately require high standards of qualifications, such as good moral character or proficiency in the law, before it admits an applicant to the Bar, but any qualification must have a rational connection with the applicant's fitness and capacity to practice law. Schware v. Board of Bar Examiners,353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957).
That the Bar may require applicants to disclose prior conduct which would have a rational connection or bearing upon an applicant's "good moral character" is not questioned. Question (6)(a) is obviously designed to elicit from the applicant information which would allow the Bar to make an honest evaluation of the applicant's good moral character. But the critical question is: What is "good moral character?" The Supreme Court of the United States, in Konigsberg v. State Barof California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810
(1957), discussed the matter of good character: *Page 569 
 "A. Good Moral Character. — The term `good moral character' has long been used as a qualification for membership in the Bar and has served a useful purpose in this respect. However, the term, by itself, is unusually ambiguous. It can be defined in an almost unlimited number of ways for any definition will necessarily reflect the attitudes, experiences, and prejudices of the definer. Such a vague qualification, which is easily adapted to fit personal views and predilections, can be a dangerous instrument for arbitrary and discriminatory denial of the right to practice law.
 "While we do not have the benefit of a definition of `good moral character' by the California Supreme Court in this case, counsel for the State tells us that the definition of that term adopted in California `stresses elements of honesty, fairness and respect for the rights of others and for the laws of the state and nation.' The decisions of California courts cited here do not support so broad a definition as claimed by counsel. These cases instead appear to define `good moral character' in terms of an absence of proven conduct or acts which have been historically considered as manifestations of `moral turpitude.' To illustrate, California has held that an applicant did not have good character who had been convicted of forgery and had practiced law without a license, or who had obtained money by false representations and had committed fraud upon a court, or who had submitted false affidavits to the Committee along with his application for admission. It should be emphasized that neither the definition proposed by counsel nor those appearing in the California cases equates unorthodox political beliefs or membership in lawful political parties with bad moral character. Assuming for purposes of this case that counsel's broad definition of `good moral character' is the one adopted in California, the question is whether on the whole record a reasonable man could fairly find that there were substantial doubts about Konigsberg's `honesty, fairness and respect for the rights of others and for the laws of the state and nation.'"
The rules governing admissions in effect at the time Reese applied for registration in 1976, provided:
 "The burden is on the applicant to establish to the reasonable satisfaction of a majority of the said committee that the applicant possesses such character and qualifications as to justify the applicant's admission to the Bar and qualify the applicant to perform the duties of an attorney and counselor at law."
Applying the definition of "good moral character" inKonigsberg as "an absence of proven conduct or acts which have been historically considered as manifestations of `moral turpitude,'" we find Reese satisfied his burden of proof when he submitted the several letters of recommendations from judges and lawyers.
The right to practice law is a valuable property right, which can be denied only by due process of law. Of course, a prerequisite to the admission to the practice of law is that the applicant must possess good moral character. In reStephenson, 243 Ala. 342, 10 So.2d 1 (1942). Here, Reese has produced evidence of good character. The Bar has not rebutted that prima facie showing by presenting competent evidence which would prove that Reese was guilty of "proven conduct or acts which have been historically considered as manifestations of `moral turpitude.'" Assuming, however, that Reese had been guilty of proven conduct or acts which have been historically considered as manifestations of "moral turpitude," that fact would not necessarily foreclose his right to certification. This Court judicially knows that persons who have been disbarred because of their conviction of a crime involving moral turpitude have later been reinstated to the practice of law.[3] *Page 570 
General Counsel for the Bar candidly admits that prior misconduct does not forever bar an applicant who has demonstrated a change of character. In brief, he states:
 "It would be inappropriate and speculative to comment upon proper action of the Committee on Character and Fitness should Reese, at some future date, file another Application for Registration as Law Student after a period of good behavior and perhaps a showing of affirmative acts demonstrating that he possesses the character and qualifications for admission."
Based on the record before us, we cannot fairly find that there was a substantial doubt about Reese's "honesty, fairness and respect for the rights of others and for the laws of the state and nation." Konigsberg.
The decision of the Board of Bar Commissioners is due to be reversed and the matter remanded for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
BLOODWORTH, FAULKNER, JONES, SHORES, EMBRY and BEATTY, JJ., concur.
TORBERT, C.J., concurs in the result.
[1] The brief of the general counsel for the Bar discusses these incidents as follows:
"At the January 3, 1979 hearing the following facts were revealed:
"(1) October, 1965 Reese was arrested as a `runaway'. He states that he may have been charged with suspicion of burglary. He was held for one night and sent back to Alabama.
"(2) January, 1967 Reese was arrested for `hopping a freight train'. He testified that no charges were filed and he was released the next day.
"(3) January, 1967 Reese was arrested and charged with disorderly conduct in Tijuana, Mexico. He testified that he was found guilty, fined $24.00 or sixteen days in jail and that he spent four days in jail.
"(4) In January, 1967 Reese was arrested on suspicion of burglary and contributing to the delinquency of a minor. This occurred in San Diego, California. Reese testified that he disclosed this to the Committee on Character and Fitness at a prior meeting and that no formal charges were ever filed against him.
"(5) June, 1967 Reese was arrested for hitchhiking in Flagstaff, Arizona. He was fined $24.00 and sentenced to fourteen days in jail. Reese testified that he recalls spending four days in jail and that the police records indicating he was jailed fourteen days are in error.
"(6) August, 1967 Reese was arrested at Morro Bay, California for possession of Marijuana. At a hearing on this charge the evidence was suppressed and Reese was released. He testified that he revealed this to the Committee on Character and Fitness at a prior hearing.
"(7) December, 1973 Reese was arrested in Memphis, Tennessee for driving while intoxicated. He testified that he forfeited a bond of $250.00. He states that he did not reveal this initially because he did not know the disposition of the case. However, upon learning of the disposition he testified that he sent the Bar Association a copy of the Clerk's record in this matter.
"(8) Reese testified that in January, 1974 he was arrested for disorderly conduct, entered a plea of guilty and was fined $55.00.
"(9) January, 1973 Reese was arrested in Greenville, Tennessee for possessing an open can of beer in a moving vehicle and fined $25.00.
"(10) November, 1974 Reese was arrested in Memphis, Tennessee on suspicion of narcotics possession. He testifies that he was released and no charges were preferred.
"(11) At some time in 1975 Reese was arrested in Destin, Florida for driving down the wrong side of the road. He states he entered a plea of nolo contendere and paid a fine of $24.00. He further testifies that the matter was ultimately dismissed upon motion of the City when the complainant failed to appear in Court. [An incorrect statement of the evidence.]
"(12) In May, 1977 Reese was arrested in Level Plains, Alabama on a citizen's complaint for disturbing the peace. The complainant failed to appear in court and the matter was dismissed. This instance was disclosed to the Committee on Character and Fitness by letter.
"(13) June, 1978 Reese was arrested for driving with a broken headlight. This matter was ultimately dismissed without formal charges."
[2] A review of the incidents shown in footnote 1 indicates that they involved "hopping a freight train," being arrested for "runaway" and suspicion, not charge of burglary, being arrested for disorderly conduct in Mexico (question (6)(a) reads: "charged with violating any state or federal law or cityordinance), charged with suspicion (not a violation) of burglary and contributing to the delinquency of a minor, charged with "hitchhiking" (application form states "minor traffic violation need not be reported").
[3] An application for reinstatement of an attorney, after the judgment of disbarment has become final, must be treated as an application for admission to the practice. In re Stephenson,243 Ala. 342, 10 So.2d 1 (1942).